Good morning, Your Honor. May it please the Court, my name is Roy Cattrall. I represent the appellant, Gary Gerlinger, and I'd like to reserve four minutes for my rebuttal time. Just bear in mind that this is the entire amount.  Your Honor, in the market for online book sales, competition has centered around three dominant sellers, Amazon.com, BarnesandNoble.com, and Borders.com. My client, Gary Gerlinger, was a direct purchaser of books online from Amazon.com, and he brought this putative What's the evidence of that, your first statement? It revolves around three. What is the admissible evidence of that? Let me put it that way. Your Honor, the evidence of that comes in two forms. The declaration of Edward Wilhelm from Borders.com references its two primary competitors that Borders.com was having trouble matching in entering the online market. That was Amazon.com and BarnesandNoble.com. More concretely, the article by Professor Goolsbee, who was one of the declarants of the defendants, gave concrete numbers with respect to that. Yeah, but isn't that declaration or whatever, was it actually even signed into penalty of perjury? It was simply a report, wasn't it? Well, Professor Goolsbee was the declarant that the defendants put in to rebut our antitrust injury brief. And so they've submitted that declarant. All right. And the evidence of that is found at Excerpts of Record 1119, where, just to put this in context, what Professor Goolsbee stated and her co-author, Professor Chevalier, that within the online bookstore industry, the two dominant players are Amazon and BarnesandNoble.com. These two firms account for more than 85 percent of online book sales, and Amazon sells between 75 and 90 percent of that. That was as of 2002, when Borders.com already exited the market as a result of the agreement in question. As I was saying, Mr. Gerlinger was a direct purchaser of Amazon.com, one of these three alleged dominant players in the online book-selling market. He brought this suit to challenge an agreement between Amazon and Borders.com, as a result of which two of those three dominant players ceased to compete. The district court, immediately after the close of pleadings on early summary judgment motions, and while explicitly precluding any discovery on the issue of damages or anticompetitive effects, entered judgment against her. This was after she denied your motions for summary judgment. Is that right? No, Your Honor. What happened was the first round of motions was the defendant's motions for a partial motion to dismiss two of the counts. Those were denied without prejudice to them being resubmitted on summary judgment. Then the parties agreed to an early round of briefing, during which we moved for a judgment on the pleadings as to liability on some of the counts, and they cross-moved for summary judgment in toto. The district judge, and it's important to keep in mind here, that there was a scheduling order, a case management order, entered by Judge Patel, by stipulation of the parties, that discovery on issues of damages and anticompetitive effects would be deferred until after those motions were decided, and that once those motions were decided, if the order didn't resolve the case, that discovery would last for approximately one year. So as those early motions, early round of motions came to the district court, no discovery on injury, no discovery on damages and anticompetitive effects had been allowed to take place. Let me just ask you, what discovery on injury would need to transpire vis-à-vis your client's own injuries? What discovery would need to have been done? Your Honor, with respect, I think this raises a point as to the Court's finding on standing, because one must distinguish, I submit, between injury for purposes of standing, which is termed injury in fact, and money damages to recover at the end of the case, to recover some compensation. We would need to... They overlap pretty much. With respect, no, Your Honor. Standing attacks the question of whether there is a legally protected interest that has been invaded by an alleged adverse effect caused by the defendants. Money damages indicates whether you win the case and what recovery, if any, you get. To hold otherwise would mean, excuse me. I'm sorry. I thought Your Honor had a question. To hold otherwise would mean that if we proceeded to trial and we lost because the jury found that we suffered no damages, that would mean that retroactively the Court would find we never had standing to be in court in the first place. And that clearly can't be right. And we know it can't be right because that's the holding of this Court. Well, there may be lots of reasons for not getting damages, and there are lots of things like trouble damages and all sorts of things like that. But if you have not been harmed in any way as a result of what happened, you have – if there's no injury, then there's no standing, right? Your Honor's question is correct. I mean, the assertion in Your Honor's question is correct. That is, if we have not been harmed or if we have not alleged a harm, we don't have standing to be in court in the first place. There's a difference between alleging a harm, injury in fact, and a legal recovery of damages. And the point here is the harm that we allege is that we were harmed in not being able to purchase books in a freely competitive market devoid of market competition. That is what the Sherman Act protects and ensures. That is the injury in fact that we alleged. How much, if any, recovery we would be allowed to receive would depend on the evidence of money damages. But as a consumer, your damages is your out-of-pocket. In other words, it's the fact that you're paying something more than you should, isn't it? It's not – you're not a competitor where you can say the competition has been lessened in this particular scenario. So your damages are different than a competitor's, isn't it? Right. Well, I certainly would agree with the last assertion that our damages are different than a competitor. We would have to show that competition was foreclosed or thwarted and that as a result we paid more or were likely to pay more for our purchases. Let me make this point by example. We could have gone into court and said we don't want damages. We didn't make any purchases after the agreement, but we made them before and we're likely to repeat them. So clearly we would not be subject to being awarded damages yet because we haven't made a purchase post-agreement. But we would still be entitled to come in and challenge the agreement as being anti-competitive even without seeking – even while seeking zero dollars in money damages. Not under your California cause of action you wouldn't be. Not after Prop 64 you wouldn't be. No, Your Honor. I think if we were a past purchaser and we were – and we made the claim that we were also going to be a future purchaser. You'd have to show – still have to show under Prop 64 – under your 17200 claim you'd have to show injury in fact, monetary injury in fact. Sticking – assuming that to be the case, sticking for a second to the Sherman Act. Correct. Assuming for the second – for a moment sticking to the Sherman Act claims, we would still be allowed to challenge the agreement as being anti-competitive and causing harm to us and seeking junctive relief to void that agreement. All while at the same time conceding that we'd be entitled to zero dollars in monetary recovery. That clearly demonstrates that having Article III standing does not depend upon being able to show recovery of damages. Well, okay. I don't – let's accept that. But let's just – you seem to agree that you have to show at least that were you to buy something – purchase a book, when the agreement is in fact you would pay more than you would have if the agreement were not in effect. And I – don't you – isn't it? Well, I think you're – I certainly would have to show that to prevail and recover damages. I think there's a difference. I'm conceding that you wouldn't have to show that you actually had bought one. But I mean, I'm accepting your position that you don't have to show that you actually had bought one. I don't know whether that's so or not. But just assuming that that's so. You would at least have to show that were you to buy one, you would pay more than you would have if there was no agreement. To prevail on the case, yes. But to establish standing, to be in court – You don't even have to show that for injury in fact, you don't? No, Your Honor. What do you have to show? What I would have to show, what my client would have to show, and what we did show is that before the agreement, there was competition between Borders and Amazon.com. There was free market competition, that there was an agreement by the defendants that a result of that agreement, competition ended between those two, and that I purchased books or was about to purchase books from one of them. That's injury in fact. There's a difference between injury in fact and legal recovery of money damages. And, Your Honor, the decision of this Court in Harmson v. Smith, which Your Honor wrote, that was a decision where the plaintiff went to trial. The plaintiffs lost on damages as to some defendants. And on appeal, the argument was raised that they lacked standing to begin with. Because if the jury found they had not suffered damages, then there was no injury in fact. That was a bank failure. Excuse me? Yes, that's a securities case. But Article III nevertheless applies. And the argument, the Court here found lack of Article III standing. What you wrote for the Court was that Article III standing is measured based on the allegations of the pleadings, and that they had alleged these. They had failed to prove, to make that proof, so they lost the case. So you're equating antitrust standing with Article III standing? No, Your Honor. The district court found that we failed in both regards. And I'm addressing the Article III prong right now. I think it, from our perspective, it is indisputable that we had Article III standing because we challenged an agreement that we claimed was anticompetitive. Now, whether we have a prudential antitrust standing centers on whether we're the And there's simply no question that a direct purchaser always is. Now, he may fail in his case. He may not recover damages. But we don't adjudge a plaintiff's standing to bring the case based on our prognostication of whether he'll prevail at trial. If we were to adopt your theory, then so long as your client asks for injunctive relief, your client can challenge any agreement, no matter what, because you're saying it's anticompetitive, even if it's an agreement to, you know, to have the lawn cut, lawn-cutting agreement, it's anticompetitive. I can seek injunctive relief and have Title III standing. Well, Your Honor, I think he would have to show that he was or would be a likely customer of the defendants. And if he's making a claim that the agreement between two defendants of which he's So any consumer agreement? Yes. I mean, he can allege that. He's probably going to be thrown out on his ear on a motion to dismiss because there are elements of a Sherman Act claim that he needs to plead. But there's no question that a consumer has standing to challenge the anticompetitive effects or the alleged anticompetitive effects of an agreement. Now, here, there's no dispute that there is an agreement between defendants. There's no dispute that there was competition between the two defendants free of this agreement prior to this agreement and that there isn't any solely as a result of the agreement, at least in the online realm, because Borders.com is no longer operated by Borders.com, and that's a consequence solely of the agreement, which is why our motion for judgment on the pleadings was limited to liability at that stage. We had yet to take any discovery on damages per the court's order. Let me center a little bit, if I may, on the liability question. Okay. Go back again to your discovery point. Yes. Would you say to repeat? Excess of record 125 is the court's order on discovery. And that the last paragraph of that order says, quote, if the court's ruling on the initial cross motions does not resolve this case, the parties will engage in a second phase of discovery. This phase would address all remaining issues, including relevant market definition, competitive effect, class issues, and damages. This phase of discovery would commence with the court's ruling on the initial cross motions and would conclude approximately a year later as set forth below. The point being that by the district judge's own order, we had yet to even commence and be allowed any discovery on damages. But let me stop you. Going back to your previous point or an earlier point, I thought the district court dismissed the antitrust claims with prejudice. And obviously, she did that on the basis of no antitrust standing. So she didn't necessarily find that there was the lack of Title III standing. It was the fact that your client didn't establish antitrust standing. Isn't that correct? No, Your Honor. First of all, she didn't dismiss them. She granted summary judgment. It wasn't a motion to dismiss. No, I thought what happened is the district court dismissed the antitrust claims with prejudice, and she granted the defendant's motion to dismiss the State claims but without prejudice. I think that's what she did in her order. Well, it was my point is it was a summary judgment ruling. It wasn't a motion to dismiss. And she did it both based on Article III and on antitrust. She questioned whether we had either, because she said, well, you haven't shown damages, so you couldn't have shown injury in fact, and therefore, you don't have this. So we could sustain her on one or the other, both or none, is that what you're saying? Well, I would hope you would sustain her on none. And let me turn a second to the agreement for a second, because I think it's important to put this agreement in context. There are specific provisions that we challenged on a cross motion on liability on judgment on the pleadings. Section 4.3 of the agreement really was one of the hearts of our argument. Prior to this agreement being in place, Amazon.com and Borders.com operated rival websites. Each operated its own website independently. Each chose what books to sell and at what price to sell. And Borders was losing basically the same amount of money that it was taking in, in terms of its operations. So therefore, why is it – I don't see why this is a price-fixing case. But it's a price – I'm sorry. Because in essence, what happened is almost like Borders agreed to license its name to Amazon. Now, one may argue a different type of antitrust – potential antitrust violation, but I don't see it as price-fixing. Well, Your Honor, the reason it's price-fixing is as follows. As I said, prior to the agreement, these were independent rival sites. Yes, but don't you have to have two products that have – the price has to be fixed as to those two products? Here, there's only one – there's only one product, and that's Amazon Books. Yes, Your Honor. All Amazon Books is doing is setting the price of its books, but on two different locations. Yes, exactly. That's their argument. But here's the problem with that. Amazon – let's say Amazon took over the Borders site, and so it's saying, it's our books on both sites. We set the price. Nothing wrong with that. Except they're not setting the price unilaterally. They're setting the price pursuant to an agreement with Borders, and that clause of the agreement has a limitation. Borders can object to that price if Amazon prices a book on Borders.com at a greater price than it prices it as Amazon.com. If the books are truly Amazon's books and Amazon's book only, Borders.com should not get a voice in that price. There is not – it's not a unilateral pricing decision. This doesn't seem to me to be a per se price-fixing situation. It's something else. And, you know, this is not a traditional price-fixing. Because traditional price-fixing, you have two products. You have an agreement between two competitors as to two different products as to what the price is going to be. You don't have that here. You just have one product in the end. Well, Your Honor, we only have one product because of the agreement mandates that it be one product. I'm not saying that there's not a potential antitrust violation. All I'm saying, it's not price-fixing. Well, with respect, we would disagree with that, and let me try to show you why. Because you have to compare the before and the after effects  If you bought War and Peace on Amazon.com before the agreement, you can get a price of $20 on one site and $18 on the other, perhaps, and you can extrapolate that hypothetical to other titles. After the agreement, that is no longer the reality. Borders, the site, the book on Borders.com will never be more expensive, or put it another way, Amazon.com price will never be lower than Borders.com. There is no longer competition on price between the two sites. Because there is, in effect, no Borders books on the Internet at that point, which is maybe, again, a different type of antitrust violation, but it's not price-fixing. Well, we alleged also an unlawful violation of Section 7 of the Clayton Act as to the whole agreement. There's another aspect of the agreement, as time is running out, that I wanted to address, which is Section 6.1. Pursuant to the agreement, not only did Amazon.com take over the Borders.com site for the period of the agreement, but Borders.com is precluded from offering any books online during that entire period, thereby allocating the market for online book sales to solely to Amazon. Amazon is now assured as a result of an agreement with its competitors that it will no longer have to compete online with Borders.com. And that assurance comes solely as a result of Section 6.1. Now, even the district judge was troubled by that agreement and found that it wasn't narrowly tailored to avoid free writing if that was the justification. But her only reason for not granting or not proceeding with that claim was that there was a question as to what the relevant market was, whether it was just online sales or online sales and brick-and-mortar sales of books. And therefore, we didn't know if there was a market allocation. But the Supreme Court's decision in Palmer v. BRG of Georgia resolves that question. It doesn't matter whether you're dealing with allocation of two markets, you get one, I get another, or two competitors within a single market saying we'll stay out of each other's segment, you get one segment. Either way, it's an unlawful market allocation. She simply used the wrong standard. Palmer v. BRG holds that. Any time left? You don't have much. I think you're running out of time. I'll reserve. Thank you. May it please the Court. I'm Joel Sanders, and I represent Amazon.com. The appellees have agreed among themselves, subject to the Court's approval, to share our time, and I intend to cede the last three minutes of my argument to Mr. Steer, Counsel for Borders. The district court correctly held that the appellant lacked standing because he offered no evidence of injury. The district court initially concluded that both Article III and antitrust standing, due to a lack of injury in fact. The district court initially concluded correctly that the appellant's antitrust claims were implausible. The appellant's claims rest on the premise that Amazon.com Yes, since this case was brought as a class action, why would there be a lack of, actual lack of Article III standing as to the class? It's, no class has been certified. But it was brought as a class. So the problem is, is that the case is dismissed out at this point in time. Your Honor, if the class representative, the plaintiff himself, does not have standing, then the case must be dismissed. Or it could be left open for the plaintiff to attempt to find another plaintiff that has standing. Your Honor, the problem with standing here is not specific to the plaintiff. It has to do with the entire theory of the case. To establish standing here, the plaintiff would have to have introduced some evidence that prices in the market would have been higher after the agreement, or would have been lower after the agreement, than in fact they were as a result of the agreement. Or some evidence that in fact selection for consumers of books was diminished as a result of the agreement. Counsel, at what point were the plaintiffs responsible for providing that proof? The district judge hears the competing motions. One motion, the plaintiff's motion, as I understand it, a motion for judgment on the pleadings, which does not require them to come forward with anything else other than what's in their complaint. You filed a motion for summary judgment. And then the district court has the supplemental order and says, look, I want to hear on the question of standing, and gives the plaintiffs 15 days. That's not really time to sort of come forward with additional discovery or additional proof at this time. If they wanted to come forward with some expert witnesses that they could get on their own, much less depose your folks, that's a pretty tough schedule if they all of a sudden went from a point of having to defend the complaint on its face, on a motion on the pleadings, to going to having to prove a part of their case. Let me address that, Your Honor. First of all, we were past the pleading stage. There had been earlier motions to dismiss. The complaint had been answered. Second, the defendants below had moved for summary judgment. Third, perhaps the plaintiffs had moved for summary judgment on what? The defendants had moved for summary judgment on all claims. The plaintiff had moved for summary judgment. It wasn't just a judgment on the pleadings. No, no. The defendants had moved for summary judgment under Rule 56. The district court may at any time raise the issue of standing. It's a jurisdictional threshold issue. And under Supreme Court precedent and under the precedent of this Court, the district court can raise it. It's antitrust standing. No, it can raise Article III standing. Yes, but not necessarily antitrust standing. Well, it can raise standing, I think, under either Article III or antitrust, but certainly Article III standing. That's very clear. And the district court can require the plaintiff at any point after the close of pleadings to come forward with evidence of a triable issue on injury. Well, as I read her order, she was asking the plaintiff to come forward with evidence and the plaintiff didn't. Well, Your Honor, that's how I read it, too. She did ask the plaintiff to come forward with evidence. I think the order was very explicit. And in fact, in her ultimate ruling on the issue of standing, in her first paragraph, she says that she had asked the plaintiff to come forward with evidence of injury. Now, the plaintiff could have sought discovery under Rule 56F. The plaintiff failed to do that. The plaintiff made a request for a deposition of one witness who was one of our defendants. Yes, Mr. Kessel. And the plaintiff in that letter offered no explanation other than a single sentence that said Mr. Kessel's deposition is relevant to the issue of antitrust injury. The district court denied that, but invited a brief from the plaintiff under Rule 56F saying exactly what it is that the plaintiff expected to get from this witness and why it was relevant. Well, as I understood the plaintiff, he said that if he could, if he could depose Kessel, that he would show that the price is increased after the agreement. Was that? He never said that in the district court. Is that what he's saying here? It's not clear to me what he's saying here. However, under Rule 56F, this Court has held that 56F discovery must identify by affidavit the specific facts that further discovery would reveal and explain why those facts would preclude summary judgment. Well, now, as I understand the Kessel, what was there, a declaration? Yes, it was a declaration. In support of your motion for summary judgment. Exactly. So it really is a summary judgment motion. Oh, yes. Yes. And he said that the prices actually went down after the agreement. That was one of the things that Mr. Kessel said, yes. Let me ask you, for Title III purposes, what would be a Title III, sufficient Title III injury when the plaintiffs are seeking injunctive relief? Article III. Sorry, Article III. Article III injury when the plaintiffs are seeking injunctive relief. Your Honor, I'm glad you asked that question because I think there was some confusion a minute ago on exactly what that requires. Supreme Court precedent and the law in this circuit, for example, that the Datagate case in this circuit, holds that for injunctive relief under Article III, there must be a cognizable danger of injury, not just a mere possibility. Cognizable danger of injury in this case would be, you know, a realistic threat that the plaintiff was going to be buying books at a higher price than he otherwise would have paid before this agreement. And on the subject of the agreement, I want to point out something on the facts that I think are perhaps a bit muddled here. There is no evidence at all in the record that Borders was a dominant online seller of books. The two sites from Appellant's Counsel both indicate that Amazon.com and Barnes & Noble were the largest online sellers of books. But the Wilhelm Declaration that he's cited to indicated that, in fact, Borders' problem was that it was an insignificant presence online in this market. And, in fact, the record evidence indicates that as well. Borders.com had a market share among all books of approximately one-tenth of 1%. Borders.com's share in the online segment, if you view that as a separate market, which we don't think is proper, would be in the neighborhood of 1%. Plaintiff's theory here below was that Amazon.com and Borders would enter into an agreement for the purpose and with the effect of raising prices and allocating markets in a place where the competitor that you're entering into the agreement with had a share of 1%, and in a market where there are numerous other sellers that are not part of the agreement. That theory in and of itself is implausible. In other words, you're saying that per se market allocation violations depend upon the party's percentage business in the market? Or is it still per se no matter what percentage it is? Your Honor, it is not per se if the purpose of the agreement is not to allocate markets. If you look at the broadcast music case, which happens to be a price-fixing case, but it makes this point nicely, it says you can't just take the terms and go with some literal rote application of them and say, ah-ha, this is a price-fix or this is an allocation, because then numerous agreements of the sort that are typically made in business and that are considered appropriate would fall into the category. The question is whether it's a per se market allocation. Just to take a step back and we can go back to that point, if we agree that there is no Article III standing, you're right. That's the end of the inquiry, because that's the first thing that needs to be addressed. What happens to Judge Patel's first published decision? I mean, do we do anything about that? I don't think so. I think you just affirm the judgment for the defendants below. I think that's the end of it. All right. I don't think so. I don't think there's anything that needs to be done by way of. We can affirm on any ground that's in the record. Yes. Yes, absolutely. Any ground fairly presented in the record. And I think there are several grounds that are fairly presented in the record, and that is one of them. Counsel, what kind of proof could the plaintiffs have come forward that would have satisfied the standard? Your Honor, there's several things that they might have come forward with, and they didn't. They might have come forward with evidence of an economic study that showed injury in fact. We would have to show injury in fact in this market? Yes. To this market, to this plaintiff? Could they have come forward with an economist from a university saying, in these kinds of arrangements, it's entirely theoretically possible that this would have an anti-competitive effect? First of all, Your Honor, they did not do that, of course. I understand. But I believe even that would not be enough. I think under Daubert and under other precedent, they need an economist under oath who would say, I have studied these markets, and based on my analysis, prices are higher than they would have been but for the agreement, or output has been reduced. If the district court were to find that sufficient, then wouldn't that also require the district court to reverse her judgments? I'm sorry. It would have led to it. She's previously granted your motions for summary judgment and denied their motions for summary judgment. The motion that she granted, initially she denied. Back to counsel's question, that there's a difference between showing that you got an injury for purposes of standing and showing that you're going to win the case. But you seem to suggest that the minimum thing that they would have to do would also be the thing that would show that they would win the case. No, Your Honor, I don't agree with that. First of all, to be clear, below, she granted summary judgment for the defendants, but she did not grant our original motion for summary judgment on the merits, the merits of the claims, where we argued the merits of each of the seven remaining claims. But going to your question, the issue of injury is just one part, just one element  is not sufficient for them to show that prices are higher. It may be sufficient to show injury, but there are several other elements of the antitrust case. They would have to show an unlawful agreement, and they would also have to show that the anti-competitive effects outweigh the pro-competitive benefits. There may be many arrangements that do result in higher prices, and in that sense could satisfy the requirement of injury under either Article III or antitrust standing, but do not violate the antitrust laws. But the district court seemed to take the view that as long as the prices were going down, that there couldn't be any antitrust injury. Your Honor, I don't think the district court took that view. Let me explain. The district court's opinion did ask the correct question. Which is, is there any evidence that prices would have been lower but for the agreement? That is in the district court's ruling on this issue. The district court pointed to evidence that prices had declined, and under the Supreme Court's Brook Group case, it says that plaintiff has a particularly hard time showing that prices would have been even lower in a market where prices have been declining. And so she took the view that they were required to show something like that. She took the view that they were required to show that prices would have been higher or, I'm sorry, would have been lower than they otherwise were. Would have been. And that that's a particularly difficult thing to show where prices have been going down, that they would need to show that prices would have gone down even faster. And she and the plaintiff had, she gave the plaintiff an opportunity to come forward with something like that, and the plaintiff didn't and instead said that we want to depose Kessel. Yes. The plaintiff made the request for the deposition of Kessel. That was the only discovery on the point requested. It did not meet the standards of Rule 56F. And by the way, that question under Rule 56F on granting the deposition of Mr. Kessel is reviewed for abuse of discretion. The district court's ruling on the other issues, of course, is reviewed de novo, but the 56F determination is an abuse of discretion standard. If we were not to accept your view, your argument with respect to Article III standing, then this becomes, does this become, in your view, a discovery case? Well, Your Honor, if you do not accept our view on Article III standing or on injury in fact, whether there is sufficient evidence in the record of injury in fact, I still think the Court can affirm on our alternative arguments on the merits of each of the claims, because I think once you look at the merits of those claims, there's some there's plenty in the record to affirm on alternative grounds. If it goes back to the district court for some reason, then, yes, I think we probably are. No. What I'm saying is, in theory, I mean, if we say, okay, there was Article III standing, then this becomes a summary judgment case, in your view, and this, and in that event, this is really, in your view, a discovery case. Is that right? I'm sorry. Now I understand. Yes. Because it all boils down to the 56F issue. No. I thought you would argue that even if there's Article III jurisdiction, she also found there's no antitrust injury in fact. So therefore, even if you lose the Article III, then you have to lose the antitrust injury in fact, which is, she also found, and then if you lose that one, then you go into the merits. Isn't that correct? Yes, yes. Okay. Okay. Okay. Your Honors, I will cede the podium unless there's more questions to Mr. Steere for Borders. Thank you. Your Honors, I'm Reginald Steere on behalf of the Borders Respondents. And while I am pleased to have this opportunity to address the Court, I find that  I will be happy to entertain any questions, particularly with respect to the record as it pertains to Borders, if the Court has them. Are you going to give your time back to him then? I'm happy to give my time back to him. Do you want to use it? You don't have to. I don't think there are any questions. That was my impression. Thank you. Thank you. Your Honors, Judge Beebe raised the question about the discovery and where we were in that stage. The important aspect to remember here is that Judge Patel granted a Rule 56F continuance precisely because she recognized that there was a need for further discovery. When we sought to avail ourselves of that discovery, she issued an order saying she had never contemplated us taking additional discovery. And you have to put this in the context of Excerpts of Record 125, which is the management order in this case contemplated and ordered us to be foreclosed from taking discovery on injury and anti-competitive effects until after her decision, and that once we started that process, it would take a year to do. To say that within 20 days we have to put forth an expert when there's been no discovery on injury or anti-competitive effects, and simply have this expert spit out an opinion on what the prices would have been to satisfy that. But didn't Judge Patel, basically she said that she found that Section 4.3 did not constitute per se price fiction. She also said that 4.3 is an ancillary position. And then she concluded there was insufficient evidence to determine whether or not it has an anti-competitive effect. She left that issue obviously open. And then she said there was insufficient evidence as to the market share agreement. And then she said, I have my doubts as to standing. What do you have in regards to standing? That's right. But the issue of standing, her doubts as to the issue of standing came about as a result of the fact that she said prices have dropped four times, and you haven't showed that you would pay a higher price. You haven't quantified what the price would be. That is injury, and that is damages. And you can't tell a litigant, I'm going to rule against you because you haven't induced evidence of injury or damages, while at the same time, I'm going to have an order issue that says you don't get to take discovery on injury and damages until after I rule on the order. That's the situation we were faced with. I see my time is up unless there's any further questions. Thank you. I think we understand the position. Thank you. Thank you. The case just argued is submitted for decision. That concludes the Court's calendar for this morning. The Court stands adjourned.
judges: Schroeder, Bybee, Wu